

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF VIRGINIA**

**RICHMOND DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 3:26-cr- 71 |
| v. | 18 U.S.C. § 371<br>Conspiracy to Commit Theft Concerning<br>Programs Receiving Federal Benefits<br>(Count 1) |
| ALISHIA SMITH,<br><br>*Defendant.* | Forfeiture Allegation |

## CRIMINAL INFORMATION

THE UNITED STATES CHARGES THAT:

## GENERAL ALLEGATIONS

At all times relevant to this Criminal Information:

1.     CC-1 was employed by the Richmond City Fire Department in Richmond, Virginia, within the Eastern District of Virginia, as an Administrative Project Analyst (Procurement Officer) from 2012 to 2025.  As the Fire Department's Procurement Officer, CC-1 was responsible for purchasing equipment and services to support the Fire Department's emergency response operations.  Before his employment with the City of Richmond, CC-1 retired from the United States Navy in 2010 as a Senior Chief Petty Officer.

2.     Beginning in or about 2017, CC-1 began embezzling funds from the Fire Department by facilitating payments to sham vendors that were owned and controlled by CC-1's friends and family members.  At CC-1's direction, the co-conspirators submitted fabricated quotes and invoices to CC-1 at the Fire Department, collected fraudulent proceeds from the City of Richmond, pocketed some of the proceeds for their personal benefit, and returned a portion of the

proceeds to CC-1 to promote and conceal the scheme and for CC-1's personal benefit. Despite creating hundreds of fabricated quotes and false invoices on behalf of the sham vendors, the co-conspirators did not provide any legitimate services or goods to the City of Richmond or the Fire Department.

3.     CC-2 was responsible for the sham vendor RPM Supply Co., LLC ("RPM"). CC-1 and CC-2 were married and resided together in a single-family residence in Henrico, Virginia. CC-2 organized RPM in September 2017 in Virginia and listed the company's principal office address as her and CC-1's personal residence. CC-2 was enlisted in the United States Navy and most recently held the rank of Master Chief Petty Officer.

4.     CC-3 and CC-4 were jointly responsible for the sham vendors McCoy & Ambrose LLC and J&E Enterprise of Virginia LLC ("J&E"). CC-3 and CC-1 met while serving together in the United States Navy in the 1990s. CC-3 is a close family member of CC-4. For a portion of the scheme, CC-4 and CC-3 resided together in Dumfries, Virginia at the same address they used to register McCoy & Ambrose and J&E

5.     The defendant, ALISHIA SMITH, was responsible for the sham vendor ERA ErrandRunningAssistants LLC ("ERA"). SMITH, who resided in Woodbridge, Virginia, was introduced to CC-1 by CC-4.

6.     CC-6 was responsible for the sham vendor T.o.L. LLC. CC-6 lived in the Atlanta, Georgia area, and he is CC-1 and CC-2's nephew. CC-6 served in the United States Navy Reserve as a Petty Officer Second Class.

7.     For purchases equal to or less than $10,000, CC-1 had authority to use his City of Richmond-issued Purchasing Card ("P-Card") to make payments on behalf of the Fire Department.

8.      For larger purchases, City of Richmond policy required CC-1 to submit requests for quotations ("RFQs") to multiple vendors that were registered with the city.  CC-1 was responsible for selecting the vendor that provided the lowest quote and for facilitating payment from the City of Richmond to the vendor.

## COUNT ONE
(Conspiracy to Commit Theft Concerning Programs Receiving Federal Benefits)

9.      Beginning in or about September 2017, the exact date being unknown, and continuing through in or about April 2025, in the Eastern District of Virginia and elsewhere, the defendant, ALISHIA SMITH, CC-1, and CC-4 did knowingly and willfully combine, conspire, confederate, and agree with each other and others known and unknown, to commit the following offense against the United States:

a.      Theft Concerning Programs Receiving Federal Benefits, that is, CC-1, being an agent of an agency of a local government, to wit, the Richmond City Fire Department, said agency having received benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, insurance, and other form of Federal assistance during the calendar years 2023 and 2024, embezzled, stole, and obtained by fraud property worth at least $5,000 and owned and under the care, custody, and control of the Richmond City Fire Department, in violation of 18 U.S.C. § 666(a)(1)(A).

## MANNER AND MEANS

10.     The preceding paragraphs are incorporated herein.

11.     CC-4 recruited SMITH to join the conspiracy in or about January 2023.  For several months, SMITH worked primarily with CC-4 and followed CC-4's instructions (a) to execute and fabricate documents that falsely purported to reflect ERA's provision of goods and services to the City of Richmond, and (b) to distribute the resulting proceeds.  In or about August 2023, SMITH

3

began working primarily with, and taking instructions from, CC-1 directly regarding the fabrication of the procurement documents and the distribution of the proceeds of the theft.

12. CC-1 initiated fraudulent transactions by sending RFQs via email to a group of recipients comprised of both sham vendors and legitimate vendors. The co-conspirators, including SMITH, submitted fabricated quotes on behalf of their respective sham vendors for goods and services to the Richmond City Fire Department to CC-1. On occasion, the co-conspirators manipulated their quotes to ensure that a particular sham vendor would provide the lowest bid in response to an RFQ.

13. Following the RFQ process, CC-1 selected a co-conspirator's sham entity as the winning vendor. CC-1 then caused the City of Richmond to issue payments to the sham vendors controlled by the co-conspirators based on the fraudulent quotes and invoices.

14. The co-conspirators, including SMITH, also caused the City of Richmond to issue fraudulent payments using CC-1's P-Card. The co-conspirators, including SMITH, manually entered CC-1's P-Card information into a payment processing platform such as Square to obtain payment from the City of Richmond to an account controlled by the co-conspirator. Many of these fraudulent transactions were in amounts just below the City of Richmond's $10,000 limit for P-Card purchases.

15. After receiving fraudulent proceeds—via either the RFQ or the P-Card process—in bank accounts held by ERA, SMITH directly and indirectly transferred a portion of those funds to CC-1. On occasion, SMITH made large cash withdrawals of fraud proceeds and provided cash to CC-1. On other occasions, SMITH directly and indirectly transferred fraud proceeds from ERA to yet another sham entity owned and controlled by CC-1. CC-1 periodically drove from the

4

Richmond, Virginia-area to Northern Virginia to meet SMITH to collect the cash and cashier's checks comprising the fraud proceeds.

## OVERT ACTS

16.    In furtherance of the conspiracy, in the Eastern District of Virginia, on or about September 25, 2023, CC-1 sent an email to two legitimate vendors and two sham vendors, including ERA, requesting quotes for gear racks to be installed in City fire stations.  On or about September 29, 2023, SMITH responded with a fictitious quote purporting to show ERA's offer to sell 20 gear racks to the City of Richmond for over $1,300 each.  On or about October 6, 2023, a co-conspirator created a fraudulent invoice that falsely reflected ERA's provision of the gear racks to the City of Richmond for a total of $49,800.00.  In truth and in fact, ERA neither obtained gear racks nor provided gear racks to the City of Richmond or the Fire Department.  Nevertheless, CC-1 used his authority within the City of Richmond to cause the City to pay $49,800.00 to an ERA business account at Wells Fargo Bank (the "ERA Wells Fargo Account") on or about October 11, 2023.  SMITH was the sole signatory on the ERA Wells Fargo Account.  From the ERA Wells Fargo Account, SMITH retained a portion of the proceeds for her personal benefit and transferred the remaining proceeds to CC-1 and CC-2.  For example, SMITH withdrew $16,800.00 via a cashier's check payable to "RPM Supply Co. LLC" on or about October 12, 2023.  A few days later, CC-2 deposited the cashier's check into an RPM business account held at Navy Federal Credit Union, on which CC-2 was the sole signatory.  As noted above, RPM, like ERA, was a sham vendor that received fraud proceeds directly from the City of Richmond; however, CC-1 and CC-2 also used RPM to collect fraud proceeds from ERA and other co-conspirators' sham vendors. CC-2 and CC-1 used the $16,800 of fraud proceeds from the ERA cashier's check for their personal benefit.

17.     In total, ERA received 22 fraudulent payments totaling more than $407,000 from the City of Richmond between January 2023 and February 2025.  For purposes of United States Sentencing Guidelines § 2B1.1(b)(1), SMITH reasonably foresaw a loss amount of more than $350,000 but less than $550,000.

18.     Also in furtherance of the conspiracy, CC-1 corruptly influenced and attempted to corruptly influence SMITH's testimony.  In early 2025, auditors working for the City of Richmond began investigating CC-1's expenditures to sham vendors.  In response, CC-1 created a "burner" email account, bondjamesii1207@gmail.com, under the pseudonym "Jamie Bond," and used that email account to communicate with co-conspirators.  On or about February 3, 2025, CC-1, posing as "Jamie Bond," directed SMITH via email to lie to investigators: "If they ask why you changed invoice format just tell them you changed your payment processing software. If they asked how we met, tell them we met at a E-VA procurement small business women conference given by the state of VA at Fort Belvoir about three years ago.  You don't have to answer the phone, you can check the voicemail to see what it's about first.  If they ask how I send out a request for a quote, say via fax, or email, unless it's an emergency then I call. If they ask if you call me, say rarely. My number (***) ***-8778."  Federal agents interviewed SMITH in February 2026.  SMITH initially followed some of CC-1's instructions by, for example, declining to state truthfully how SMITH met CC-1.  SMITH was, however, ultimately truthful and forthright in response to questions from the federal agents.

(In violation of 18 U.S.C. § 371.)

## FORFEITURE ALLEGATION

Pursuant to Rule 32.2(a) Fed. R. Crim. P., the defendant is hereby notified that upon conviction of the offense listed in Count One of this Criminal Information, the defendant shall

6

forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

If property subject to forfeiture cannot be located, the United States will seek an order forfeiting substitute assets.

(In accordance with Title 18, United States Code, Section 982(a)(7) and Title 21, United States Code, Section 853(p)).

Respectfully submitted,

Todd W. Blanche
Acting Attorney General

Date:  June 22, 2026          By:  _____
                                   Robert S. Day
                                   Assistant United States Attorney

                                   _____/ For
                                   Thomas A. Garnett
                                   Assistant United States Attorney